UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PACIFIC EMPLOYERS INSURANCE COMPANY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CLEAN HARBORS ENVIRONMENTAL SERVICES, INC., et al., <br><br> Defendants. <br><br>——————————————————— <br><br> CLEAN HARBORS ENVIRONMENTAL SERVICES, INC., et al., <br><br> Counterclaim and Third-Party Plaintiffs, <br><br> v. <br><br> PACIFIC EMPLOYERS INSURANCE COMPANY, <br><br> Counterclaim Defendant <br><br> and <br><br> NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, <br><br> Third-Party Defendant. | No. 08 C 2180 <br><br> Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

Third-Party Plaintiffs Clean Harbors, Inc. and Clean Harbors Environmental Services, Inc. (collectively "Clean Harbors") are seeking indemnification based on an insurance policy issued by Third-Party Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"). Before the Court are Clean Harbors' and National Union's

cross motions for summary judgment on the issue of whether the so-called pollution exclusion in the policy unambiguously excludes coverage of Clean Harbors' claim.

## BACKGROUND

Effective November 1, 2000, for the period ending November 1, 2001, Pacific Employers Insurance Company ("PEIC"), Plaintiff and Third-Party Defendant in this case, issued an occurrence-based Comprehensive General Liability ("CGL") insurance policy to Clean Harbors (the "PEIC Policy"). (Pl.'s 56.1(a)(3) ¶ 3.) Effective the same dates as the PEIC Policy, National Union issued an excess umbrella liability insurance policy (the "National Union Policy") that was excess to, and followed form to, the PEIC Policy. (*Id.* ¶ 4.)

In 2003, Eddie and Sandy Lopez filed suit against Clean Harbors in Illinois state court, alleging that Eddie Lopez ("Lopez") had suffered injury and illness as a result of his exposure to toxic chemicals at Clean Harbors' Chicago facility. (*Id.* ¶ 5.) Clean Harbors removed the suit to federal court, where it was assigned to the Hon. James F. Holderman, as *Lopez v. Clean Harbors Environmental Services, Inc.*, No. 05 C 3645 (the "*Lopez* lawsuit"). (*Id.* ¶ 5.)

The underlying facts of the *Lopez* lawsuit were as follows. During the early part of 2001, Lopez was employed as a truck driver for Waste Management, Inc., picking up garbage from commercial sites. (*Id.* ¶ 6.) Clean Harbors' facility in Chicago, Illinois, was on Lopez's route. (*Id.* ¶ 6.) The facility was engaged in the treatment, transfer, storage and disposal of hazardous wastes, including paint solvents, emergency-response spill clean-ups, spent pesticides, poisons, refinery wastes and household hazardous waste. (Def.'s 56.1(a)(3) ¶ 6.) At Clean Harbors' Chicago facility, Lopez would pick up dumpsters containing crushed 55-gallon drums from outside the Fuels Blending Operation building. (Pl.'s 56.1(a)(3) ¶ 6.) In doing so, Lopez drove

2

his truck to the dumpsters, attached a hook to the dumpster and used a mechanical device to lift the dumpster onto his truck, securing the load if necessary. (*Id.* ¶ 6.) Lopez then drove the truck to a landfill to dispose of the crushed drums. (*Id.* ¶ 6.)

On April 9, 2001, Lopez went to the emergency room because he was feeling dizzy and nauseous. (*Id.* ¶ 7.) Lopez returned to work but was readmitted to the hospital on April 29, 2001. (*Id.* ¶ 7.) Lopez is currently confined to a wheelchair and suffers from brain damage. (*Id.* ¶ 7.) In his suit against Clean Harbors, Lopez alleged that the illness and injuries he suffered were due to exposure to chemicals at Clean Harbors' Chicago facility. (*Id.* ¶ 8.) Specifically, Lopez alleged that he inhaled poisonous and toxic fumes that were emitted from fuel at Clean Harbors' Chicago facility. (Def.'s 56.1(a)(3) ¶ 9.) On November 13, 2008, the *Lopez* lawsuit was settled at a pretrial conference mediated by Chief Judge Holderman. (Pl.'s 56.1(a)(3) ¶ 38.)

## ANALYSIS

An insurer's duty to defend arises when the facts alleged in the underlying complaint fall within, or potentially within, the language of the policy. *American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 479 (1997) (*Koloms*). In construing the language of an insurance policy, a court's primary objective is "to ascertain and give effect to the parties' intentions as expressed in their agreement." *Id.* If the terms of a policy are unambiguous, they must be given their plain and ordinary meaning. *Id.* However, if the terms of a policy are susceptible to more than one meaning, they are considered ambiguous. *Id.* Ambiguous terms must be construed in favor of the insured against the insurer. *Id.* Provisions that limit or exclude coverage must be interpreted

3

liberally in favor of the insured. *Id.* Finally, a court must "construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Id.*

The issue before the Court is whether the pollution exclusion in the National Union Policy is ambiguous.[1] The National Union Policy provides:

> "this insurance does not apply to any liability arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of Pollutants anywhere in the world."

The term "Pollutant" is defined as:

> "any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Wastes include materials to be recycled, reconditioned or reclaimed."

The parties agree that the Illinois Supreme Court's holding in *American States Insurance v. Koloms* is the controlling law on whether the pollution exclusion is ambiguous. In *Koloms*, the court examined a pollution exclusion essentially identical to the one at issue in this case. A furnace in a commercial building malfunctioned and began to emit carbon monoxide and other noxious fumes, causing several employees of one of the building's tenants to become sick. Upon being sued by these employees, the building's owners tendered the complaints to their insurer. The insurer brought suit, seeking a declaration that it did not have a duty to defend or indemnify the owners due to the pollution exclusion in the owners' CGL policy. The insurer argued that the term "pollutants" was unambiguous and that, under the plain meaning of the policy language,

---

[1] A policy may be ambiguous in one of two ways. First, the language itself may be intrinsically unclear such that its meaning cannot be determined without some extrinsic knowledge. *Koloms*, 177 Ill.2d at 481. Second, language that appears clear on its face may become uncertain when applied to particular facts. Thus, it is possible for the meaning of a term to be clear in certain circumstances and ambiguous in others. *Id.*

4

"the emission of carbon monoxide fumes constituted the 'release' of a gaseous 'irritant or contaminant.'" *Id.* at 477. The building owners countered that the pollution exclusion did not apply to injuries caused by a leaking furnace but, rather, only to injuries resulting from industrial, commercial or large-scale pollution. *Id.*

Reviewing the case law, the *Koloms* court identified a "vast divergence of jurisprudence from courts around the country" on the issue. *Id.* at 485. Some courts hewed closely to the text of the pollution exclusion. For example, in *Bernhardt v. Hartford Fire Insurance Co.*, 102 Md. App. 45 (1994) (*Bernhardt*), a case closely examined by *Koloms*, the court held that carbon monoxide poisoning resulting from an obstructed chimney flue in a residential building fell within the pollution exclusion. The *Bernhardt* court rejected the insured's argument that "notwithstanding the literal language of the exclusion, the parties intended that it apply only to persistent industrial pollution of the environment, and not to an accident of the kind generally covered by a comprehensive business liability policy." *Bernhardt*, 102 Md. App. at 51.

Other cases discussed by *Koloms* point out that a literal reading of the terms in the pollution exclusion would vastly expand its scope. *Koloms* quoted the Seventh Circuit's observation that:

> "Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution."

5

*Pipefitters Welfare Educational Fund v. Westchester Fire Insurance Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992); *see also Westchester Fire Insurance Co. v. City of Pittsburg*, 768 F.Supp. 1463, 1470 (D.Kan. 1991) (objecting to a broad definition of "pollutants," noting "there is virtually no substance or chemical in existence that would not irritate or damage some person or property.")

The *Koloms* court suggested that the source of disagreement is found "in the fact that the language of the clause is . . . quite specific on its face, and yet a literal interpretation of that language results in an application of the clause which is quite broad." *Koloms*, 177 Ill.2d at 487. The court stated that "courts wishing to focus exclusively on the bare language of the exclusion will have no difficulty in concluding that it is . . . unambiguous." *Id.* However, the court rejected the literal interpretation approach, stating that it was "troubled" by what it "perceive[d] to be an overbreadth in the language of the exclusion as well as the manifestation of ambiguity which results when the exclusion is applied to cases which have nothing to do with 'pollution' in the conventional, or ordinary, sense of the word. The court, therefore, held that the pollution exclusion applied "to only those hazards traditionally associated with environmental pollution." *Id.* at 489.

In support of its holding limiting the scope of the pollution exclusion to traditional pollution cases, the *Koloms* court looked to the history of the pollution exclusion as developed by the insurance industry: "Our review of the history of the pollution exclusion amply demonstrates that the predominate motivation in drafting an exclusion for pollution-related injuries was the avoidance of the enormous expense and exposure resulting from the explosion of *environmental* litigation." *Koloms*, 177 Ill.2d at 492 (internal quotations and citations omitted; emphasis in *Koloms*). The court concluded that it could not "ignore [the pollution exclusion's] *raison d'être*,

and apply it to situations which do not remotely resemble traditional environmental contamination." *Id.* at 493.

Turning to the arguments in this case, it is clear from *Koloms* that the dispositive question as to whether the pollution exclusion applies is whether or not the damages alleged in the *Lopez* lawsuit are an instance of traditional environmental pollution. Any argument based on a literal reading of the text of the pollution exclusion must fail; it is not enough to say that Lopez was injured by an "irritant or contaminant" that had been "released." However, the term "traditional environmental pollution" is not defined by *Koloms*. Both sides have presented arguments as to why the *Lopez* allegations do or do not fall within that category of harm.

Clean Harbors argues that Lopez's injuries have nothing to do with "pollution" in the conventional or ordinary sense of the word. Clean Harbors stresses that the injuries were sustained during the course of ordinary business operations: "Clean Harbors . . . would not expect the pollution exclusion to apply to an ordinary (if severe) industrial accident, even though it involved the alleged 'release' of 'contaminants' from dumpsters that Mr. Lopez picked up at Clean Harbors' facility as part of his routine day-to-day work activities." (Br. at 12-13.) Clean Harbors suggests that the *Koloms* court used the term "traditional environmental pollution" to refer to "the discharge or spread of a 'pollutant' in such a way that poses a threat to something other than a geographically and temporally isolated event." (Resp. Br. at 9-10.) Clean Harbors points out that the injury alleged was isolated both geographically and temporally. It did not involve widespread dispersal of chemicals, and no other individual complained of similar chemical exposure around that time.

7

National Union counters that this case falls squarely within the category of "traditional environmental pollution." Exposure to toxic waste, National Union argues, is a quintessential example of industrial pollution exposure and is precisely the sort of injury intended to fall within the pollution exclusion. National Union takes issue with Clean Harbors' emphasis on the fact that Lopez's injuries occurred during day-to-day work activities; according to National Union, that fact is irrelevant to whether the pollution exclusion applies. The exclusion, National Union points out, contains no exception for claims arising out of ordinary business activities such as workplace mishaps. The toxic fumes to which Lopez was exposed are clearly pollution. According to National Union, that settles the matter.

An article by Professor Jeffrey Stempel, which addresses this question, is instructive. *See* Jeffrey Stempel, *The Insurance Policy as Thing*, 44 Tort Trial & Ins. Prac. L.J., 2009, at 813. Stempel examines the history of the pollution exclusion and concludes that "the background of the exclusion and the means by which it was introduced to regulators makes clear that insurers wanted to avoid liability for the type of widely dispersed, long-tail, hard-to-detect, and expensive-to-litigate injuries associated with pollution and contamination claims." *Id.* at 851-52. According to Stempel, the pollution exclusion was not intended to cover "abrupt and isolated discharges" that are "not part of a global pattern" and do not "lead to the type of widely dispersed, decades-long injury associated with historical pollution claims." *Id.* Stempel also considers the history of the CGL policy: "Viewed in historical context, it is quite clear that the CGL policy was designed to provide broad coverage for the types of general liability claims that were likely to confront commercial policyholders as a consequence of their normal operations." *Id.* at 851. Stempel draws a distinction between harm caused by pollution and injuries sustained

during the day-to-day operations of a company. For example, "if a worker is harmed by spurting gasoline . . . this is not the type of pollution to be excluded from CGL coverage, notwithstanding that the plaintiff is hurt in substantial part because of the irritating qualities of the gasoline rather than from pressure or slipperiness alone." Stempel concludes that this is "the type of run-of-the-mill mishap that one knows can strike a business at any time" and "the type of mishap that the CGL was designed to protect against." *Id.* at 852-53.

Stempel's analysis is persuasive and consistent with the Illinois Supreme Court's reasoning in *Koloms*. A principal object of a CGL policy is to insure against liability for personal injury. That a personal injury was caused by chemicals does not remove it from the intended scope of the policy based on the pollution exclusion language before this Court. This is so even if the chemicals are classified as contaminant or irritants and the accident was caused by their escape or release; as the *Koloms* court held, the pollution exclusion only applies to situations of "*environmental* contamination." *Koloms*, 177 Ill.2d at 493 (emphasis added). In the context of the facts of this case, Lopez sustained injuries during his day-to-day duties. That those injuries were sustained from the chemicals in drums he was hauling does not place the claim within the pollution exclusion.

## CONCLUSION

For the reason stated above, the Court finds that the language of the pollution exclusion to be ambiguous as applied to the facts at issue in this case. Therefore, Clean Harbors' motion for summary judgment is granted; National Union's motion for summary judgment is denied.

Dated: February 4, 2010

JOHN W. DARRAH
United States District Court Judge